**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **PATAGON MANAGEMENT LLC,** | **Case No. 1:23-cv-02742-VM** |
| Plaintiff, | **Hon. Victor Marrero** |
| -against- | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION BY ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND ORDER GRANTING ALTERNATIVE SERVICE** |
| **WEI "MAX" WU,** | |
| Defendant. | |

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION..........................................................................................................1

II. RELEVANT FACTS ....................................................................................................1

    A.  **Defendant Wu misled investors by inducing them to invest in a DAO which he then used to abscond with investor assets.**....................................2

        1.  Defendant launches the DAO and promises investors that purchasing SPA tokens grants them governance rights in the DAO. .....2

        2.  Defendant's tokens are securities...........................................................4

    B.  **Defendant begins to execute on his scheme.** ...................................................4

        1.  Investors begin to express concerns with Defendant's governance of the DAO............................................................................................5

        2.  Defendant announces "Spartacus 2.0" and restates his promises of decentralized governance...................................................................5

        3.  It becomes clear that Defendant had no intention to provide any tangible return for investors and the investors vote to dissolve the DAO..................................................................................................6

    C.  **Defendant refuses to honor the investors' vote and instead signals an intention to convert the assets.** ..................................................................7

        1.  Investors, including Plaintiff, demand that Defendant honor his promises, but Defendant instead proposes new schemes.......................7

        2.  Defendant expresses intent to move treasury funds, thus risking that the funds would be lost forever........................................................8

        3.  Defendant has already absconded with the funds, and if Defendant maliciously transfers the funds, then the assets will be untraceable.......9

III. ARGUMENT ...............................................................................................................10

    A.  **Plaintiff meets the requirements for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction.**...........................11

        1.  Plaintiff will suffer irreparable harm absent relief...............................12

        2.  This Court has authority to freeze the treasury assets...........................13

**TABLE OF CONTENTS (cont'd)**

PAGE

B.     **Plaintiff is likely to succeed on the merits.**................................................14

    1.     Breach of Contract. ................................................................14

    2.     Unjust Enrichment. ................................................................15

    3.     Money Had and Received. ....................................................16

    4.     Securities Act Violations—Unregistered Offer and Sale of Securities.................................................................................17

    5.     Specific Performance ............................................................19

    6.     Imposition of a Constructive Trust. ......................................20

    7.     Accounting. ...........................................................................21

C.     **Balance of equities favors issuing a Temporary Restraining Order.**..........22

D.     **Public interest favors issuing a Temporary Restraining Order.** ................23

E.     **Fed R. Civ. P. 65 permits this Court to enter a Temporary Restraining Order without notice to Defendant.**...........................................23

F.     **This Court should permit Plaintiff to serve Defendant Wu by alternate means.** ...............................................................................24

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*3M Co. v. Performance Supply, LLC*,
  458 F. Supp. 3d 181 (S.D.N.Y. 2020).....................................................................................11

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019).............................................................................11, 15

*Astrove v. Doe*,
  Case No. 22-CV-80614-RAR, 2022 WL 2805345 (S.D. Fla. June 17, 2022).......................13

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019).............................................................................18, 19

*Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010)..............................................................................................11, 12

*Dubai Islamic Bank v. Citibank, N.A.*,
  126 F. Supp. 2d 659 (S.D.N.Y. 2000).....................................................................................16

*Edge Group WAICCA, LLC v. Sapir Group, LLC*,
  705 F. Supp. 2d 304 (S.D.N.Y. 2010).....................................................................................20

*Fed. Trade Comm'n v. Dluca*,
  No. 0:18-cv-60379-RKA, 2018 WL 1830800 (S.D. Fla. Feb. 28, 2018) ...............................13

*Firemen's Ins. Co. of Newark, New Jersey v. Keating*,
  753 F. Supp. 1146 (S.D.N.Y. 1990).........................................................................................12

*Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*,
  333 F. Supp. 3d 307 (S.D.N.Y. 2018).....................................................................................22

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999).................................................................................................................14

*Heissenberg v. Doe*,
  No. 9:21-cv-80716-RKA, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021) ...............................13

*In re: Dreier, LLP*,
  544 B.R. 760 (Bankr. S.D.N.Y. 2016).....................................................................................20

*In re Koreag, Controle et Revision S.A.*,
  961 F.2d 341 (2d Cir. 1992).....................................................................................................21

*In re Style Site Marketing, Inc.*,
  253 B.R. 503 (Bankr. S.D.N.Y. 2000).....................................................................................21

## TABLE OF AUTHORITIES (cont'd)

**PAGE(S)**

*Jacobo v. Doe*,
No. 1:22-cv-00672-DAD-BAK (BAM), 2022 WL 2052637 (E.D. Cal. June 7,
2022) ............................................................................................................................12, 13

*Lagemann v. Spence*,
No. 1:18-CV-12218-GBD, 2019 WL 4014846 (S.D.N.Y. Jan. 24, 2019) ......................12, 23

*LCX AG v. John Doe Nos 1–25*,
Order to Show Cause and Temporary Restraining Order (Index No.
154644/2022, the Supreme Court of the State of New York, 2 June 2022) ..........................25

*Mason Tenders Dist. Council Pension Fund v. Messera*,
No. 95 Civ. 9341 (RWS), 1997 WL 223077 (S.D.N.Y. May 1, 1997) ..................................14

*Matter of Vuitton et Fils S.A.*,
606 F.2d 1 (2d Cir. 1979)....................................................................................................24

*Noble Sec., Inc. v. Ingamar Co.*,
No. 21-CV-1372 (MKB), 2021 WL 2012508 (E.D.N.Y. May 20, 2021) ..............................25

*Parsons & Whittemore Enters. Corp. v. Schwartz*,
387 F. Supp. 2d 368 (S.D.N.Y. 2005)..................................................................................17

*Philip Morris USA Inc. v. Veles Ltd.*,
No. 06 CV 2988 GBD, 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007) ...................................25

*Precise-Mktg. Corp. v. Simpson Paper Co.*,
No. 95 CIV. 5629 (LMM), 1996 WL 285364 (S.D.N.Y. May 30, 1996) ..............................15

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)....................................................................................12

*Republic of Philippines v. Marcos*,
806 F.2d 344 (2d Cir. 1986).................................................................................................14

*Rio Props., Inc. v. Rio Int'l Interlink*,
284 F.3d 1007 (9th Cir. 2002) .............................................................................................25

*Romain v. Seabrook*,
No. 16 Civ. 8470, 2017 WL 6453326 (S.D.N.Y. Dec. 15, 2017)..........................................22

*SEC v. Kik Interactive, Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020)...................................................................................18

*SEC v. Telegram Group Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020)...................................................................................18

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946).................................................................................18, 19

*Sokoloff v. Harriman Estates Dev. Corp.*,
  96 N.Y.2d 409 (2001)..................................................................................20

*U.S. S.E.C. v. Universal Exp., Inc.*,
  475 F. Supp. 2d 412 (S.D.N.Y. 2007)...........................................................17

*United States v. Benitez*,
  779 F.2d 135 (2d Cir. 1985).........................................................................21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65..........................................................................................24

Fed. R. Civ. P. 4(f)(3)....................................................................................25

Securities Act of 1933.........................................................................17, 18, 19

I.      **INTRODUCTION**

Plaintiff Patagon Management LLC ("Patagon") submits this memorandum of law in support of its application for a temporary restraining order and Order to Show Cause for preliminary injunction to freeze the digital assets currently held in the cryptocurrency wallets identified in Paragraph 32 of the attached Affidavit of Diogenes Casares in Support of Application By Order to Show Cause for Temporary Restraining Order and Request for Substitute Service ("Casares Aff.").

II.     **RELEVANT FACTS**

This action concerns Defendant Wei Wu's scheme to obtain millions of dollars' worth of investor assets so that he could then use those assets for his own benefit.  Defendant wrongfully obtained these assets by selling unregistered securities to investors, including Plaintiff, pursuant to certain agreements, including promises to develop products and governance features related to those securities. First Amended Complaint ("Am. Compl.") ¶ 1.  Defendant then breached his obligations to provide investors (each who hold certain "SPA tokens," defined below) with governing rights with respect to certain assets and when and whether those assets could be redeemed; instead, Defendant is holding more than $35 million in investor assets hostage.  *Id.*

Defendant's recent activities show that the more than $35 million in investor assets that Defendant improperly holds in cryptocurrency wallets on the blockchain—including funds of Plaintiff's—are at risk of being lost forever.  Casares Aff. ¶¶ 20–21, 30-51.  Plaintiff has no choice but to request that this Court act as soon as possible to order the Defendant to freeze the more than $35,0000,000 of investor assets in these particular current cryptocurrency wallets and preclude Defendant from taking further action in transferring or otherwise converting those assets.

A.    **Defendant Wu misled investors by inducing them to invest in a DAO which he then used to abscond with investor assets.**

Defendant is the founder, creator, and primary technical developer of the scheme intended to harm Plaintiff and those similarly situated via the Spartacus Finance DAO ("Spartacus DAO"). Am. Compl. ¶ 3; Casares Aff. ¶¶ 5, 7–9.   A "DAO" is a "Decentralized Autonomous Organization," which commonly involves a group of stakeholders coming together to make decisions, typically facilitated by a blockchain-based voting system.  Am. Compl. ¶ 9; Casares Aff. ¶ 2.  In many cases, those stakeholders usually invest their crypto-based assets together and then vote on certain decisions with the goal of growing those assets.  Am. Compl. ¶ 9.

Relying on this community trust and camaraderie, Defendant Wu pitched the Spartacus DAO as being built on decentralization and "community" governance.  Am. Compl. ¶ 10; Casares Aff. ¶ 8.  In reality, and as set forth herein, Defendant did not implement community governance, and instead created the DAO so that he could personally benefit from, and ultimately abscond with investor assets.  Am. Compl. ¶ 10.

1.    **Defendant launches the DAO and promises investors that purchasing SPA tokens grants them governance rights in the DAO.**

To accomplish his scheme, Defendant took advantage of a group investment structure familiar to DAOs, where a group of people contribute "liquidity" to a pool or pools of funds.  *Id.* ¶ 11; Casares Aff. ¶ 11.  People can contribute liquidity in a variety of ways, the general practice of which is transferring cryptocurrency tokens into a pooled "wallet" or wallets.  Am. Compl. ¶¶ 11–12; Casares Aff. ¶ 11.  A cryptocurrency wallet, similar to a physical fiat wallet, is a smart contract address that "holds" cryptocurrency.  Casares Aff. ¶ 31.  A cryptocurrency wallet can be controlled by one or multiple persons, who are required to approve any transactions into or out of the wallet. Casares Aff. ¶ 31.  Defendant represented that the resulting fund pool would be contributed to a common "treasury" (a particular group of wallets) and other pooled funds

(altogether, the "treasury" as used herein) which he promised would be controlled by multiple persons as representatives of the Spartacus DAO, who would act as directed by the voting consensus of the community of SPA holders.  Am. Compl. ¶ 11; Casares Aff. ¶¶ 8, 18–19. Defendant promised the treasury would grow through various ventures and projects that he would lead for the Spartacus DAO, including employing "strategies to earn risk-adjusted return with [community] governance."  Am. Compl. ¶ 11; Casares Aff. ¶¶ 5, 7.   Defendant included all of these promises on a blog, where he promised to build various products with the funds and return profits from those products to the investors, including Plaintiff.  Am. Compl. ¶ 11.

To start getting investors to contribute to the treasury, Defendant conducted a sale of blockchain-based digital asset cryptocurrency SPA tokens ("SPA tokens" or "SPA") to Plaintiff and other U.S. persons marketed via online platforms including Discord (an instant messaging platform often used in the blockchain space), Twitter, and other social media, as well as prominently on the Spartacus website and blog.  Am. Compl. ¶ 11.  SPA tokens are fungible blockchain-based assets that Defendant promised would be "the governance token for Spartacus DAO."  *Id.* ¶ 11; Casares Aff. ¶¶ 5, 18.  Accordingly, Defendant represented that, by purchasing a SPA token, a purchaser would automatically gain (i) pro rata right to earnings from the use of treasury assets and (ii) governance rights in the DAO—including with respect to how their own investment would be utilized.  Casares Aff. ¶¶ 6–9, 11–12, 15, 18–19.  Beginning on or about October 31, 2021, Defendant created (known as "minting") and sold 30,000 SPA tokens at a price of approximately $10 per token on a first-come, first-serve basis (the "Initial Offering")— including to cryptocurrency wallets controlled by Defendant.  Am. Compl. ¶¶ 12–13.  As time went on, Defendant created and sold more SPA tokens at various prices, on each occasion promising that the returns would be used to build value for holders of the tokens.  *Id.* ¶ 12.

### 2.      Defendant's tokens are securities.

SPA tokens are securities under federal securities law.  *Id.* ¶ 13.  Purchasers of SPA, including Plaintiff, had a reasonable expectation of future profit based upon Defendant Wu's marketing of the tokens and his efforts in managing Spartacus DAO and its treasury.  *Id.* Defendant referred to token purchasers as "investors" and represented that the funds generated from the Initial Offering and future sales would be used to fund Spartacus DAO's development work and ultimately returned to investors who functioned as pro rata equity holders in the venture. *Id.*; Casares Aff. ¶ 27.  Defendant promised that the SPA token purchasers would see returns on their investments, both through dividend-like instruments and due to an increased future value of the token on secondary markets where SPA can be traded.  Am. Compl. ¶ 13; Casares Aff. ¶¶ 5, 7–8, 12, 15, 17.  Defendant also promised to build products, including a cryptocurrency exchange, that would incorporate and increase the value of SPA and related assets.  Am. Compl. ¶ 13; Casares Aff. ¶ 7–8.   In totality, Defendant promised SPA purchasers (such as Plaintiff) long-term, passive returns based on his purported efforts.   Defendant promised eye-popping returns with advertised interest, at times, as high as 262,518.7%, 299,745.6%, and 302,727.4% (for a 302,727.4% APY, a *five-day* return would be 11.6060%).  Casares Aff. ¶ 14.  Defendant promised to decentralize control of the treasury (such as by holding community votes) but was ultimately the sole controller of the assets in the treasury.  Am. Compl. ¶¶ 18, 39; Casares Aff. ¶ 36.  Because of this, and Defendant's position as founder, developer, and promoter of the DAO and SPA, the success of an investment in SPA tokens was wholly dependent on Defendant's efforts, and whether he lived up to his promises to investors. Am. Compl. ¶¶ 3, 13.

### B.      Defendant begins to execute on his scheme.

After the initial sale, Defendant precipitated the sale of SPA by continuing to offer and solicit purchases of the token through an extensive marketing campaign on the Spartacus website

and social media. *Id.* ¶ 17. These statements further pulled investors into Defendant's scheme, resulting in Defendant accumulating tens of millions of assets. *Id.* ¶ 18. Those assets are held by Defendant in blockchain-based technology, and despite Defendant's promises of community control, only Defendant has the key to access the assets. *Id.* Though Defendant kept making promises that investors would have a say in how the assets would be used (*e.g.*, Casares Aff. ¶ 29), in reality, he simply continued to further his scheme to abscond with investor funds.

1.   **Investors begin to express concerns with Defendant's governance of the DAO.**

By early April 2022, approximately *six months* following the initial sale of SPA, nearly $61,000,000 in funds had amassed in the treasury under Defendant Wu's control. *Id.* ¶ 19. At that time, investors began to raise concerns about the status of the project. *Id.* On Discord, Defendant called these concerned investors "[ . . . value] hunters" and disregarded their concerns, still promising a "rising floor for SPA and [that he would] continue to build a valu[able] foundation for SPA." Am. Compl. ¶ 20.

2.   **Defendant announces "Spartacus 2.0" and restates his promises of decentralized governance.**

On April 6, 2022, Defendant made an announcement on Discord, presenting "[t]he next phase of Spartacus Finance." *Id.* ¶ 21; Casares Aff. ¶ 23. Defendant announced that he would be creating a new for-profit venture: a decentralized cryptocurrency exchange called Spartacus Exchange ("SPEX"). Am. Compl. ¶ 21; Casares Aff. ¶ 23. Defendant purported to address the concerns of the misled investors by promising current holders of SPA that they could redeem their tokens at an amount he referred to as their risk-free-value ("RFV"), based on a "snapshot" (or recorded list of holders) taken approximately 10 minutes before the announcement. Am. Compl. ¶ 22; Casares Aff. ¶ 23. Defendant said that the RFV would be calculated by accounting for the value of the treasury in relation to the number of SPA tokens investors had already contributed to

a staking pool (an interest-bearing disposition of SPA tokens, which means that the investor had pledged their tokens to the pool in exchange Defendant's promised return).  Am. Compl. ¶ 22.

Defendant would only benefit if investors did not remove their funds from this pool (thereby exiting his scheme).  *Id.* ¶ 23.  Accordingly, Defendant offered certain incentives to those who did not redeem their SPA tokens, such as through assurances of future returns including "buyback[s]" of SPA to "maintain[] constant buy pressure" which would manipulate the market for SPA and inflate its value.  *Id.*  He also promised perpetual returns to SPA holders through "emissions" (additional token rewards paid over time) as well as allocations of an additional, second security—the fungible token termed "SPEX."  *Id.*

At this point, Defendant made investors believe that they would have a part in decision-making by orchestrating a vote of SPA holders where voters could respond "yes" or "no" on the proposal for the redemption option to build Spartacus 2.0.  *Id.* ¶ 24.  The vote passed.  *Id.*  While some investors were able to get out of the pool at this time, in reliance on Defendant's promises, roughly half of the investor-held SPA tokens were not redeemed and, as a result, half of the assets held prior to April 6, 2022 remained in the treasury after redemption—about $30,000,000.  *Id.* ¶ 26.  Upon information and belief, Defendant accumulated additional SPA tokens in anticipation of the redemption which he controlled.  *Id.* ¶ 27; Casares Aff. ¶ 24.  In particular, upon information and belief, Defendant used 18 distinct cryptocurrency wallets to make more than $4,300,000 in profits, by purchasing SPA in the weeks leading up to the redemption announcement, thus profiting from his knowledge of the timing and price of the redemption.  Am. Compl. ¶¶ 27–28; 24.

### 3.    It becomes clear that Defendant had no intention to provide any tangible return for investors and the investors vote to dissolve the DAO.

Following the redemption, Defendant disappeared for weeks and months at a time, holding their assets hostage in the treasury.  *Id.* ¶ 29; Casares Aff. ¶ 26.  By then, Plaintiff and the other

investors realized that Spartacus DAO was a scam and that the Defendant had deceived them.  Am. Compl. ¶ 30.

On September 22, 2022, five months after the Spartacus 2.0 announcement, Spartacus DAO investors (the holders of SPA tokens who were told by the Defendant that their tokens were voting shares in the venture) organized and held a vote of no confidence in the Spartacus DAO leadership, namely Defendant Wu.  *Id.* ¶ 31; Casares Aff. ¶ 26.  The purpose of the vote (the "Dissolution Vote") was to dissolve the DAO and provide token holders with the opportunity to redeem their tokens for the assets of the treasury.  Am. Compl. ¶ 31; Casares Aff. ¶ 26.  100% of participants voted in favor of dissolution and redemption.  Am. Compl. ¶ 31; Casares Aff. ¶ 26.

### C.   Defendant refuses to honor the investors' vote and instead signals an intention to convert the assets.

Defendant refused to honor the Dissolution Vote and instead made clear that he had no intention on honoring his contractual promises to investors.  Am. Compl. ¶ 32; Casares Aff. ¶¶ 27–28.  Instead, Defendant called investors by derogatory names and ignored repeated demands that he relinquish control of the treasury and related assets.  Am. Compl. ¶ 32; Casares Aff. ¶ 27.

### 1.   Investors, including Plaintiff, demand that Defendant honor his promises, but Defendant instead proposes new schemes.

With few other options, Plaintiff sought legal help. On January 3, 2023, Plaintiff's counsel sent a demand letter to Defendant by email—to which Defendant did not respond.  *Id.* ¶ 33; Casares Aff. ¶ 37.  But, Defendant then returned to Discord on January 16, 2023, again promising to offer new plans going forward.  *Id.*  Such plans never materialized, instead, Defendant put forth a proposed scheme which both ran contrary to the desires of the Spartacus DAO community and raised red flags about his intentions to abscond with the assets. Casares Aff. ¶¶ 37–41.  Specifically, Defendant, after months of questions from concerned investors, put forth a plan to "diversif[y]" the treasury assets by removing them from the treasury wallets and into risky decentralized-finance

("DeFi") strategies that are prone to hacking, manipulation, and risk.  *Id.*  In particular, moving assets in this way would make the treasury assets susceptible to manipulation of the value for the benefit of Defendant, a hack, in which they would be lost and likely irrecoverable or, a *faked* hack by Defendant himself, allowing him to abscond with the assets.  *Id.* ¶ 41.  Other DAOs have been victimized by such behavior.  *Id.*

On the Discord forum, where Spartacus DAO members convene to communicate, there was an overwhelming lack of willingness from the DAO participants, including Plaintiff, to agree to this risky procedure.  *Id.* ¶ 42.  But, seemingly having an about-face about community governance, Defendant attempted to host a vote of SPA holders on the proposal (the "Diversification Vote"),[1] which failed with 99.96% of represented interests voting no.  *Id.* ¶ 43.

With the vote to remove the funds from the treasury having failed, Defendant has become increasingly confrontational and has openly expressed his intent to unilaterally take action as he sees fit.  For example, despite the failed Diversification Vote, and in direct contravention of his promises of community governance, Defendant communicated that the vote was "malicious" and, in response to questions from concerned investors about whether he would honor the results of the overwhelming no-vote to the proposal, Defendant cryptically stated on two occasions that he would ignore the results of the vote, including that: "we will have to do what we believe is right." Am. Compl. ¶¶ 41–42; Casares Aff. ¶¶ 47–48.

## 2. Defendant expresses intent to move treasury funds, thus risking that the funds would be lost forever.

On April 23, 2023, Defendant specifically stated an intention to move forward with his diversification plan, stating: "[a]s we have proposed earlier, the first thing would be to reduce LP

---

[1] *SIP-015: Spartacus 2.0 with the redemption option*, SNAPSHOT.ORG, https://snapshot.org/#/spartacusdao.eth/proposal/0x34656a7bd9e58821f4cb81d0ca374bd14fa3966235fe0 e7c03397a7045d84340 (last visited Mar. 29, 2023).

and then farming with treasury assets to bring back revenues, regardless of what the RFV hunters actions are." Casares Aff. ¶ 48.  After months of nefarious activity and strings of broken promises, Defendant is now stating his intention to move, abscond with, or remove the treasury funds— potentially with the aid of the sanctioned Tornado Cash mixer. *Id*. ¶ 49.

Upon information and belief, wallets believed to be controlled by Defendant in his personal capacity have interacted with the protocol "Tornado Cash."  *Id*. ¶ 44–45.  According to the United States Treasury, which has sanctioned Tornado Cash and its related entities, Tornado Cash is a virtual currency "mixer" that launders the proceeds of cybercrimes, including those committed against victims in the United States.[2]  A "mixer" service is used by persons to obscure the normally-traceable path of assets on a blockchain. *Id*. ¶ 46. Defendant's apparent willingness to use this mixer places the treasury assets at extreme risk that they would, as the Treasury Department has stated, be used to "launder…malicious cyber actors' [such as Defendant's] funds". *Id*.

### 3.     Defendant has already absconded with the funds, and if Defendant maliciously transfers the funds, then the assets will be untraceable.

There is a pervasive risk that, due to Defendant's sole control of the treasury funds in dispute in this action and willingness to use sanctioned mixing services to hide his trail, Plaintiff could *never* recover his funds if Defendant moves these assets during the pendency of this litigation.  *Id*. ¶ 50–51.  Once funds are maliciously transferred on the blockchain, the potential to recover them is significantly reduced, and it may be prohibitively expensive to do so—even with

---

[2] U.S. Department of the Treasury (Aug. 8, 2022). *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, TREASURY.GOV, https://home.treasury.gov/news/press-releases/jy0916 (last visited Apr. 25, 2023). ("Tornado Cash is a virtual currency mixer that operates on the Ethereum blockchain and indiscriminately facilitates anonymous transactions by obfuscating their origin, destination, and counterparties, with no attempt to determine their origin. Tornado receives a variety of transactions and mixes them together before transmitting them to their individual recipients. While the purported purpose is to increase privacy, mixers like Tornado are commonly used by illicit actors to launder funds, especially those stolen during significant heists.").

millions of dollars at stake.  *Id*.  In addition, Defendant has shown that he is willing to use Tornado

Cash, despite its sanctioned status, to obscure his misuse of SPA tokens.  *Id*.  If Defendant removes

the funds from the treasury wallets, and uses Tornado Cash to launder them, it is unlikely that

Plaintiff would have an ability to recover its funds.  *Id*.  And for all practical purposes, Defendant

already *has* absconded with the funds—they are not accessible by Plaintiff, despite Plaintiff (and

fellow investors) having taken all possible actions, including participating in a supposedly binding

"governance" vote, to return them.  Instead, Plaintiff is forced to resort to this legal action, and

now asks this Court to maintain the status quo during the pendency of this request for relief.

Further, there is particular risk involved with the traceability of assets in this case because

Defendant has evaded service, concealing himself behind an online cloak of pseudo-anonymity.

Casares Aff. ¶ 3; Conley Decl. ¶ 3.  Plaintiff has been able to identify Defendant but has been

unable to personally serve him in this action.  Casares Aff. ¶ 3; Conley Decl ¶¶ 6–8, 11–14.  It is

believed that Defendant may currently reside in China or another unknown foreign location, such

that transfer of funds may result in the use of offshore entities in unknown locations to hide the

funds.  Conley Decl.  ¶¶ 15–16.

## III.   ARGUMENT

The Court should enter Plaintiff's proposed temporary restraining order and Order to Show

Cause for preliminary injunction to prevent Defendant Wu from absconding with Plaintiff's assets

and to ensure that those assets do not disappear forever.[3]  Courts have entered similar orders in the

cryptocurrency context when a bad actor wrongfully maintains custody of a plaintiff's assets, and

---

[3] Plaintiff acknowledges that it has only a *pro rata* claim with respect to the $35 million worth of
assets controlled by Defendant on behalf of SPA investors, but argues that all assets should be
frozen until a full accounting can occur and the *pro rata* amount due can be determined. This
request takes into account Defendant's obfuscation and misuse of assets, as well as the fact that
(as detailed below) Defendant has no personal claim to the assets in question.

for good reason:  if the Order is not entered, then Plaintiff (and other investors) will face irreparable harm.  In addition, given Plaintiff's demonstration that traditional service methods would be futile, the Court should grant Plaintiff's request for substituted service by email, non-fungible token at blockchain-based addresses associated with Defendant, or in the Discord forum where Defendant is known to be active.

### A.     Plaintiff meets the requirements for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction.

The applicable standard for issuance of a temporary restraining order is identical to the standard governing the issuance of a preliminary injunction.  *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).  A plaintiff must show that (1) it "is likely to suffer irreparable harm in the absence of" relief, (2) it is "likely to succeed on the merits" (or at least raises "sufficiently serious questions"), (3) the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010); *see also AIM Int'l Trading, LLC v.* Valcucine, SpA, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002) (same).

 "Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).  Plaintiff need only show a "likelihood of success on the merits of at least one of [its] claims," *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citation omitted), or that there are sufficiently "serious question[s] going to the merits to make them a fair ground for trial," *Citigroup*, 598 F.3d at 34.  A showing of "absolute certainty" is not required—only "a showing that the probability of prevailing is better than fifty percent." *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. 2020).

**1.      Plaintiff will suffer irreparable harm absent relief.**

Plaintiff will undoubtedly suffer irreparable harm if this Court does not enter a temporary restraining order.   Defendant Wu's actions and recent messages on Discord show that he is preparing to move, abscond with, or remove the treasury funds.  Casares Aff. ¶¶ 48–51.  And, in doing so, it's possible that he will use the Tornado Cash mixer to hide his trail.  *Id.* ¶¶ 44, 49.  Additionally, it appears that Defendant has in the past raised significant funds from investors, only to disappear. *Id*. ¶ 49 n.36.

"It is familiar law that where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless, injunctive relief is proper." *Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990) (collecting cases).  And district courts across the country have applied this basic rule in the cryptocurrency context, agreeing that the risk of irreparable harm is "likely in matters concerning fraudulent transfers of cryptocurrency due to the risk of anonymous and speedy asset dissipation." *Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAK (BAM), 2022 WL 2052637, at *5 (E.D. Cal. June 7, 2022); *see also Lagemann v. Spence*, No. 1:18-CV-12218-GBD, 2019 WL 4014846, at *2 (S.D.N.Y. Jan. 24, 2019) (granting request for temporary restraining order and barring defendant from transferring assets from any cryptocurrency wallet or cryptocurrency trading account); *Heissenberg v. Doe*, No. 9:21-cv-80716-RKA, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (finding irreparable harm to be likely if a temporary restraining order were not granted due to the "speed and potential anonymity of cryptocurrency transactions"); *Fed. Trade Comm'n v. Dluca*, No. 0:18-cv-60379-RKA, 2018 WL 1830800, at *2-*3 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, No. 0:18-cv-60379-KMM, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018) (same).  As such, a temporary restraining order is appropriate to prevent the immediate and

irreparable harm likely to be caused when the asset at issue involves cryptocurrency. *Jacobo*, 2022 WL 2052637, at *5 ("Because 'it would be a simple matter for [defendant] to transfer . . . cryptocurrency to unidentified recipients outside the traditional banking system' and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive relief.") (quoting *Dluca*, 2018 WL 1830800, at *2)).

Plaintiff will suffer irreparable harm absent the relief sought. Without a temporary restraining order, Plaintiff is powerless to stop Defendant from continuing to engage in improper conduct aimed at frustrating any future judgment in this case. As evidenced in the above, Defendant has already taken a variety of actions designed to obscure his malicious actions and withhold assets from Plaintiff, and Defendant's recent actions and messages demonstrate an intention to transfer the assets out of the DAO wallets.  Casares Aff. ¶ 48–49.  There is a significant risk that Defendant may dissipate the money invested by Plaintiff or simply transfer those funds into untraceable cryptocurrency accounts or to offshore entities organized in unknown locations. *Id.* ¶ 50–51.  Because cryptocurrency transactions are instantaneous and anonymous, it is imperative to freeze the assets in their current wallets to maintain the status quo to avoid dissipation of the digital assets wrongfully being held by Defendant.  *See Astrove v. Doe*, Case No. 22-CV-80614-RAR, 2022 WL 2805345, at *4 (S.D. Fla. June 17, 2022) ("considering the speed with which cryptocurrency transactions are made, and the anonymity of those transactions, it is imperative to freeze the Assets Under Claim in the Destination Addresses to maintain the *status quo* and avoid dissipation of the money illegally taken from Plaintiff.").

### 2. This Court has authority to freeze the treasury assets.

Generally, federal courts lack the authority to freeze assets of the defendant before the claim have been brought to judgment. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*

*Inc.*, 527 U.S. 308, 322 (1999).  However, where (as here) a plaintiff seeks equitable relief, the Court has authority to issue a preliminary injunction to freeze the assets in question—which are not rightfully Defendant's to possess.  *See Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (preventing transfer of property that would place them out of reach of judgment collection); *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95 Civ. 9341 (RWS), 1997 WL 223077, at *4 (S.D.N.Y. May 1, 1997) ("[T]he United States Supreme Court and the Second Circuit have made Rule 65 available to secure assets for the ultimate judgment.").  Courts in the Second Circuit have endorsed three different standards of "extraordinary circumstances" justifying the securing of assets pendente lite: "(1) that the defendant may be unable to satisfy a final monetary judgment; (2) that the final relief requested is equitable in nature; (3) that the frozen assets are related to the subject matter of the action."  *Mason Tenders*, 1997 WL 223077, at *8.  Here, Plaintiff's allegations meet all three: (1) as established above, Defendant is attempting to secret away Plaintiff's assets; (2) Plaintiff requests equitable relief, namely specific performance, imposition of a constructive trust, and an accounting; and (3) the assets sought to be frozen are the direct proceeds of Defendant's illegal conduct that is the subject matter of this action.

### B.    Plaintiff is likely to succeed on the merits.

To warrant injunctive relief, Plaintiff need only show a "likelihood of success on the merits of at least one of [its] claims," *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citation omitted).  Here, Plaintiff is likely to succeed on each of its claims.

### 1.    Breach of Contract.

 "The elements for a breach of contract action are: (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by one party; and (4) damages."  *Precise-Mktg. Corp. v. Simpson Paper Co.*, No. 95 CIV. 5629 (LMM), 1996 WL 285364 (S.D.N.Y. May 30, 1996).  As established in the Amended Complaint, Plaintiff and Defendant entered into a contract

when Plaintiff purchased SPA tokens from Defendant, and in exchange, Defendant promised to implement certain features to support the Spartacus DAO to help investors like Plaintiff generate profits from their purchased tokens and allow for token redemption opportunities.

Additionally, Defendant breached his contractual promises to treat the holders of SPA as governing members of the Spartacus DAO project.  Casares Aff. ¶¶ 5, 22, 39.  On September 22, 2022, SPA token holders organized and held the Dissolution Vote—a vote of no confidence in Spartacus DAO's leadership—whereby they voted to dissolve the Spartacus DAO and offer token redemption.  *Id.* ¶ 26. The vote passed with 100% of participants voting in favor of dissolution and redemption.  *Id.*   Despite promising, at the time of sale, that tokens also equaled voting shares and a pro rata interest in the assets of Spartacus DAO, Defendant objected to the September vote and refused to act in accordance with the results.  *Id.* ¶ 27–28.   Both during and after the vote, Defendant posted derogatory remarks on Discord calling out the voters as "looters" and "hunters." *Id.*   Despite numerous attempts by various SPA token holders to encourage or demand that Defendant honor the vote, Defendant continues to ignore the token holding community in breach of its contract.  *Id.*   Finally, Plaintiff has suffered damages by, among other things, Defendant refusing to redeem the SPA tokens.

As set forth above, Plaintiff has demonstrated that it is more likely than not that Plaintiff and Defendant entered into an enforceable contract pursuant to which there has been an undisputed lack of performance by Defendant that has left Plaintiff harmed.

### 2.   Unjust Enrichment.

Plaintiff is likely to succeed on the merits of its claim for unjust enrichment because Defendant has accepted the direct benefits of its violation of its agreement with Plaintiff.  To adequately plead a claim for unjust enrichment, the plaintiff must show that "(1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the

benefit would be unjust.'." *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 669 (S.D.N.Y. 2000). Here, Plaintiff and other investors purchased SPA tokens under the terms of an agreement relating to the SPA tokens, by which Defendant Wu agreed to implement certain features to support the Spartacus DAO to help investors like Plaintiff generate profits from their purchased tokens and allow for token redemption opportunities. Am. Compl. ¶ 13; Casares Aff. ¶¶ 5–19, 23. However, Defendant has yet to deliver on any of its obligations—primarily with respect to such tokens being voting, equity interests in the venture—but also with respect to issuing certain dividend-like instruments, building products like a cryptocurrency exchange that would incorporate and increase the value of SPA and related assets, or further developing any other projects through or on behalf of the DAO. Casares Aff. ¶ 20. Defendant continues to refuse to return the more than $35 million held for the benefit of Plaintiff and Spartacus DAO, despite the token holders voting to dissolve Spartacus DAO and redeem their tokens, creating an inequity if Defendant is allowed to retain the money. Defendant's unlawful refusal to return the $35 million has inequitably enriched it and deprived Plaintiff and investors of $35 million.

### 3. Money Had and Received.

"To maintain an action for money had and received, New York law requires the following elements: (1) defendant received money belonging to plaintiff, (2) defendant benefitted from the receipt of money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Parsons & Whittemore Enters. Corp. v. Schwartz*, 387 F. Supp. 2d 368, 377 (S.D.N.Y. 2005). As already evidenced, Defendant obtained money belonging to Plaintiff when Plaintiff purchased SPA tokens from Defendant. Casares Aff. ¶ 25. Plaintiff purchased these tokens expecting a profit and with the understanding that Defendant would permit Plaintiff to redeem the token at a future date and be able to use the token for governance of the DAO. Instead, Defendant appears to have transferred assets to personal accounts, or otherwise

withdrawn or misused funds.  *Id.* ¶ 21.  And despite the token holders voting to dissolve the DAO and redeem the SPA tokens, Defendant continues to withhold the funds.

### 4.   Securities Act Violations—Unregistered Offer and Sale of Securities.

#### a.   Section 5 of the Securities Act of 1933

Section 5 of the Securities Act prohibits any person from offering or selling a security in interstate commerce unless it is registered. To prove a *prima facie* violation of Section 5, plaintiff must show "(1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." *U.S. S.E.C. v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).  The defendant may rebut this *prima* facie case by showing that the securities involved were not required to be registered."  *Id.*

The facts alleged demonstrate that it is more likely than not that Plaintiff will establish each element of its Section 5 claim.  Defendant promoted, solicited or sold SPA tokens and SPA bonds to Plaintiff through the internet, Discord, and other forms of electronic communication thereby using instruments of communication in interstate commerce to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  Am. Compl. ¶ 12.  No registration statement was filed with the SEC or has been in effect as required by Section 5.  *Id.* ¶ 52.  Moreover, Defendant cannot in good faith establish that the SPA tokens and bonds did not need to be registered.  The offers and sales of crypto assets must be registered with the SEC if they are offers and sales of securities, which the Securities Act defines to include an "investment contract," i.e., if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). As explained in Section II, the tokens represented equity interests in a for-profit venture, were variably priced bearer

instruments marketed as and capable of sale on secondary markets, and Defendant created reasonable expectations of profit for persons such as Plaintiff as investors in SPA tokens who were reliant on the efforts of Defendant. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019); *SEC v. Telegram Group Inc*., 448 F. Supp. 3d 352 (S.D.N.Y. 2020); *SEC v. Kik Interactive, Inc*., 492 F. Supp. 3d 169 (S.D.N.Y. 2020).

### b.      Section 12(a)(1) of the Securities Act of 1933

Section 12(a)(1) of the Securities Act provides a private right of action against any person who "offers or sells a security" in violation of Section 5 of the Securities Act, and that person will be held liable if he "successfully solicits the purchase of securities, so long as he is motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352, 357 (S.D.N.Y. 2019) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)).

At the time of issuance, the SPA tokens and SPA bonds were securities within the meaning of Section 12(a)(1) of the Securities Act because they involved an investment in a common enterprise with the expectation that profits or other gain would be produced by others' efforts. *See Balestra*, 380 F. Supp. 3d at 353–357 (applying the *Howey* test to find that ATB Coin, another decentralized cryptocurrency, is a security). Purchasers of SPA, including Plaintiff, had a reasonable expectation of future profit based upon Defendant's marketing of the tokens and their investment-related features, and Defendant's efforts in managing Spartacus DAO and its treasury. Defendant represented that the funds generated from the initial offering would be used to fund Spartacus DAO's development work and promised returns on investment for the SPA purchases through dividend-like instruments and increased future value of the token in secondary markets. Am. Compl. ¶ 13.   Defendant also promised to build products, including a cryptocurrency exchange, that would incorporate and increase the value of SPA and related assets. *Id.*  The success

of SPA tokens and the Spartacus DAO itself was dependent on the efforts of Defendant as sole controller of the assets in its treasury.

Defendant actively publicized and conducted the sale of the SPA tokens via online platforms including Discord, Twitter and other social media, as well as prominently on the Spartacus website and blog. *Id.* These promotional efforts evidence that Defendant "engaged in steps necessary to the distribution of the unregistered security thereby subjecting [him] to primarily liability for any violation of § 12(a)." *Balstra*, 380 F. Supp. 3d at 358 (internal citation and quotation omitted).

Based on the foregoing, it is more likely than not that Plaintiff will prevail on its Securities Act claims against Defendant.

### 5.      Specific Performance

To succeed on its claim for specific performance under New York law, Plaintiff must show (1) a valid contract between the parties; (2) that Defendant has breached that contract; (3) that Plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (4) that Plaintiff has no adequate remedy at law. *Edge Group WAICCA, LLC v. Sapir Group, LLC*, 705 F. Supp. 2d 304, 312 (S.D.N.Y. 2010). The decision whether or not to award specific performance is one that rests in the sound discretion of the trial court. *See Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415 (2001).

There can be no dispute that the parties entered into a binding contract when Plaintiff purchased SPA tokens in exchange for Defendant's promise to give, in exchange, governing rights in the Spartacus DAO, including with respect to how the funds would be used and when and whether to redeem them. Am. Compl. ¶¶ 11–12, 39, 44. Therefore, when the SPA token holders, including Plaintiff, voted to dissolve Spartacus DAO and redeem the tokens, Defendant was obligated and able to do so.

Defendant's breach leaves Plaintiff with no adequate remedy at law.  The anonymous nature of cryptocurrency and the risk that Defendant will use Tornado Cash to launder the cryptocurrency inhibits Plaintiff's ability to trace or otherwise monitor the funds that it invested in the DAO, which causes immediate harm given Defendant's actions to transfer funds beyond Plaintiff's reach.  Am. Compl. ¶¶ 27, 70; Casares Aff. ¶¶ 49–51.  Accordingly, Plaintiff faces the prospect of immediate and continued irreparable harm due to Defendant's continued diminution of the value of its SPA tokens.

### 6.    Imposition of a Constructive Trust.

A constructive trust may be imposed when property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest. *In re: Dreier, LLP*, 544 B.R. 760, 767 (Bankr. S.D.N.Y. 2016).  Generally, the party seeking to impose a constructive trust under New York law must show: (i) a confidential or fiduciary relationship; (ii) a promise express or implied; (iii) a transfer of the subject was made in reliance on that promise; and (iv) unjust enrichment.  *Id.* (internal citations and quotations omitted).  In addition, the party asserting a constructive trust must be able to trace funds held in escrow to the specific property at issue. *United States v. Benitez*, 140 (2d Cir. 1985).

Notwithstanding the stated requirements, the remedy is a flexible one and the facts need not satisfy every element in all cases. *In re Style Site Marketing, Inc.*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000).  The four factors provide important guideposts, but the constructive trust doctrine is equitable in nature and should not be rigidly limited.  *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992).  "[A] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."  *Id.* at 352-53 (internal citations and quotations omitted).

As already stated above, Plaintiff purchased SPA tokens relying on Defendant's promises that token holders would have voting rights in how Spartacus DAO was run and managed and would have rights over token redemption. Defendant, through misleading statements, broken promises, and unlawful acts has obtained and held Plaintiff's cryptocurrency, which in equity and good conscience he should not be permitted to hold. Am. Compl. ¶¶ 31–40. After obtaining these funds, including pro rata amounts due to Plaintiff from the treasury, Defendant has since transferred some of these assets to his own personal accounts and is trading with those funds under his personal name. Am. Compl. ¶ 78; Casares Aff. ¶¶ 21, 24, 33. Although Defendant has diverted those funds for personal use, the cryptocurrency assets at issue are specific, identifiable property and can be traced to certain blockchain-based addresses.[4] Plaintiff, therefore, will more likely than not establish that a constructive trust should be imposed to make Plaintiff whole.

### 7.  Accounting.

Plaintiff will also succeed on its request for an accounting of the treasury. "Under New York law, there are four elements to a claim for equitable accounting: (1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting." *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (internal citations and quotation marks omitted); *Romain v. Seabrook*, No. 16 Civ. 8470, 2017 WL 6453326, at *6 n.8 (S.D.N.Y. Dec. 15, 2017) (citing *In re Guardianship of Kent*, 188 Misc.2d 509, 729 N.Y.S.2d 352, 353 (N.Y. Sup. Ct. 2001)).

Plaintiff meets each element of a claim for equitable accounting. Plaintiff and Defendant Wu are in a fiduciary relationship in which Plaintiff entrusted Defendant with a monetary

---

[4] 0xFa5a5F0bC990Be1D095C5385Fff6516F6e03c0a7;
0x8CFA87aD11e69E071c40D58d2d1a01F862aE01a8;
0xB7396019BC1Ee7E771155D138D57Ee9aBf16F5b4; and
0x251616944e771cD83d57aB7b073D291FE841A4DF. *See* Casares Aff. ¶ 32.

investment, thus satisfying both the first and second prongs of a claim for equitable accounting. As previously noted, the anonymous nature of cryptocurrency and the risk that Defendant will use Tornado Cash to launder the cryptocurrency inhibits Plaintiff's ability to trace or otherwise monitor the funds that it invested in the DAO, which causes immediate harm given Defendant's actions to transfer funds beyond Plaintiff's reach.  As such, Plaintiff has no adequate remedy at law, thereby satisfying the third prong of a claim for equitable accounting.  Finally, investors have demanded transparency with respect to the use of funds being held in treasury.  Am. Compl. ¶ 37.  Plaintiff thereby satisfies the fourth and final prong of a claim for equitable accounting and is entitled to an accounting of the treasury.

### C. Balance of equities favors issuing a Temporary Restraining Order.

While Plaintiff would be severely prejudiced if Defendant dissipates the funds wrongfully withheld from Plaintiff, Defendant faces no such prejudice.  It is worth noting that the specific relief sought by Plaintiff with respect to the temporary restraining order goes to four particular blockchain-based addresses which are not the personal property of Defendant. The funds in these wallets are not rightfully Defendant's to remove absent direction of the governing holders of SPA. Thus, an order freezing those assets will, at worst, delay Defendant from secreting away those funds (which are not rightfully Defendant's to remove) to untraceable cryptocurrency accounts, and at best, maintain the status quo for Plaintiff and other investors to recover their valuable assets. As shown above, Defendant faces no harm from freezing the treasury assets, while Plaintiff will face irreparable harm.  *See Lagemann v. Spence*, Civ. A. No. 1:18-cv-12218-GBD, 2019 WL 4014846, at *2 (S.D.N.Y. Jan. 24, 2019) ("balance of hardships also favors Plaintiffs, because a Temporary Restraining Order would preserve the *status quo ante* and prevent irreparable harm until such time as the Court may hold a hearing").

**D.    Public interest favors issuing a Temporary Restraining Order.**

A temporary restraining order here would serve the public interest, including preventing

the conversion of Plaintiff's assets, protecting against the risk that such funds will be illegally

transferred—including via a sanctioned money mixer—and by promoting the objective of the

Financial Crimes Enforcement Network (FinCEN) by assuring the public that courts will protect

investors' assets from bad actors and aid investors in their recovery of wrongfully withheld assets

when they can be readily located and traced to specific locations rather than waiting until after the

funds have been transferred out to untraceable cryptocurrency accounts.  *Lagemann*, 2019 WL

4014846, at *2.

In contrast, there is little public interest in not freezing the assets in question. While

arguably there is an interest in not attaching assets unnecessarily, Plaintiff has shown that

Defendant has no legal reason to remove the assets from these wallets during the pendency of this

dispute—in fact, doing so would be another breach of Defendants explicit promises to Plaintiff

and others that the assets would be held for their benefit and at their voting direction.

**E.    Fed. R. Civ. P. 65 permits this Court to enter a Temporary Restraining
Order without notice to Defendant.**

Federal Rule of Civil Procedure 65(b) permits this Court to enter a temporary restraining

order without notice to the adverse parties if "specific facts in an affidavit or a verified complaint

clearly show that immediate and irreparable injury . . . will result to the movant before the adverse

party can be heard in opposition," or "the movant's attorney certifies in writing any efforts made

to give notice and the reasons it should not be required."

Plaintiff has met both requirements of Rule 65(b).  As for the first prong, and as

summarized above and stated in more detail in the supporting Affidavit of Diogenes Casares,

Plaintiff will suffer immediate and irreparable harm absent a temporary restraining order.  The

anonymous nature of cryptocurrency tokens—and specific risk that Defendant will use Tornado

Cash to launder them as described in the Affidavit of Diogenes Casares—significantly inhibits

Plaintiff's ability to trace the funds invested in Spartacus DAO, which causes immediate harm

given Defendant's actions to transfer funds beyond Plaintiff's reach.   Because of this, advance

notice of the next stage of this action is likely to "render fruitless further prosecution of this action

. . . . [which is] precisely contrary to the normal and intended role of 'notice' . . . .",  ex parte relief

is therefore warranted.  *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979).   As for the

second prong, as described in the Declaration of Will M. Conley, Plaintiff has been unable to serve

Defendant due to Defendant's evasiveness and likely status as a foreign resident, therefore making

notice impossible.  Defendant has evaded service since this lawsuit was first filed, despite diligent

and good faith attempts by Plaintiff's counsel to make contact and serve.  Conley Decl. ¶¶ 2, 6–8,

11–14.

**F.     This Court should permit Plaintiff to serve Defendant Wu by alternative means.**

Plaintiff seeks to serve Defendant via alternative service, such as by email at two email

addresses    believed    to    be    associated    with    Defendant    (maxawei@gmail.com    and

spartacusfinance@gmail.com), by non-fungible token at blockchain-based addresses believed to

be associated with Defendant or in the Discord forum where Defendant is known to be active. *See*

*e.g.*, *LCX AG v John Doe Nos 1–25*, Order to Show Cause and Temporary Restraining Order (Index

No. 154644/2022, Supreme Court of the State of New York, 2 June 2022).  Investigation thus far

reflects that Defendant may be in China.  Conley Decl. ¶¶ 15–16.

Federal Rule of Civil Procedure 4(f)(3) permits a court to authorize service through various

methods, such as "publication, ordinary mail, mail to the defendant's last known address, delivery

to the defendant's attorney, telex, and most recently, email." *Rio Props., Inc. v. Rio Int'l Interlink*,

284 F.3d 1007, 1016 (9th Cir. 2002).   Where alternative service is reasonably calculated to notify parties of legal action, it satisfies due process.  *Noble Sec., Inc. v. Ingamar Co.*, No. 21-CV-1372 (MKB), 2021 WL 2012508, at *6 (E.D.N.Y. May 20, 2021) (finding service via e-mail sufficient); *Philip Morris USA Inc. v. Veles Ltd.*, No. 06 CV 2988 GBD, 2007 WL 725412, at *3 (S.D.N.Y. Mar. 12, 2007) (finding service via e-mail sufficient where defendant conducted business "entirely through electronic communications."); *F.T.C. v. PCCare247 Inc.*, No. 12 CIV. 7189 PAE, 2013 WL 841037, at *5–6 (S.D.N.Y. Mar. 7, 2013) (finding that service via e-mail and Facebook satisfies due process requirements where (1) a high likelihood of defendants receiving and responding to e-mail sent to particular addresses was demonstrated and (2) notice via Facebook messages was presented as a supplemental means of service likely to provide notice to Defendants, particularly where Defendants have embraced the new form of communication via which service is proposed).

As described above, alternative service is warranted in this case because Plaintiff has been unable to serve Defendant through traditional means and it is believed that Defendant may currently reside in China.  However, Defendant remains active and is believed to be available by email and at blockchain-based addresses via NFT, as well as in Discord.  Alternative service, via the above-proposed methods, is therefore reasonably calculated to notify Defendant of pending legal action.

Dated:  April 26, 2023                                    Respectfully submitted,


John R. Hardin                                           By: */s/ Emily B. Cooper*
**PERKINS COIE LLP**                                         Emily B. Cooper
500 N. Akard Street, Suite 3300                              ECooper@perkinscoie.com
Dallas, TX 75201-3347                                        Hellen Park
Tel:  (214) 965-7700                                         HPark@perkinscoie.com
Fax:  (214) 965-7799                                     **PERKINS COIE LLP**
JohnHardin@perkinscoie.com                                   1155 Avenue of the Americas, 22nd Floor
(*Admitted to practice pro hac vice)*                        New York, NY 10036-2711
                                                             Tel:  (212) 262-6900
Will M. Conley                                               Fax:  (212) 977-1649
**PERKINS COIE LLP**
33 E. Main Street, Suite 201                             *Attorneys for Plaintiff*
Madison, WI 53703-3095                                   *Patagon Management LLC*
Tel:  (608) 663-7460
Fax:  (608) 663-7499
WConley@perkinscoie.com
(*Admitted to practice pro hac vice*)